# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

AARON PERNELL,
*also known as Arya Pernell, No. 17601-035,*

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No.  25-cv-001126-SPM

Judge Stephen P. McGlynn

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      Correction Officer First Name Unknown Ross (Ross) used his position as a correctional officer at Federal Correctional Institution (FCI) Marion to sexually abuse and harass Plaintiff Arya Pernell (Plaintiff), a prisoner under his control.[1]

2.      Despite reports across the Bureau of Prisons (BOP), BOP leadership continued to allow sexual predators, like Ross, unfettered access to sexually abuse vulnerable prisoners in their custody and control.

3.      BOP leadership had actual and constructive knowledge of rampant sexual abuse across the BOP and failed to implement any systems congruent with policy to protect those in its care.

4.      As a direct result of these failures, Plaintiff was sexually assaulted.

---

[1] As listed in the caption of this matter and as described further in the First Amended Complaint, Plaintiff is transgender, uses the name Arya, and uses she/her pronouns. Plaintiff has another pending matter before this court under case number 3:23-cv-374-SPM that was originally filed *pro se* on February 6, 2023. ECF No. 1. The claims in that matter, as set forth in the Amended Complaint, include deliberate indifference to a medical need, among others. ECF No. 83. This Court granted the parties' request to stay the matter. ECF No. 173.

5.      Plaintiff suffers from ongoing trauma because of sexual violence and mental torment that she suffered, including symptoms such as insomnia, fear, humiliation, depression, anxiety, and mental duress.

6.      Plaintiff brings this suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to her by various personnel, including Officer Ross, within the scope of their employment with the BOP.

7.      Plaintiff seeks redress for Defendant's unlawful conduct, which caused her to suffer permanent and catastrophic injuries, and which could have and should have been prevented.

## JURISDICTION AND VENUE

8.      This action involves claims arising under United States and Illinois state law. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1346(b)(1), 1367, and 1343(a)(4).

9.      Venue is proper in this district under 28 U.S.C. § 1391 because acts or omissions giving rise to the claims occurred in this district.

## PARTIES

10.      At all times relevant herein, Plaintiff was a transgender female inmate incarcerated in the BOP.

11.      At all times relevant herein, Plaintiff was incarcerated in BOP facilities, including FCI Marion, located at 4500 Prison Road, Marion, Illinois 62959.

12.      Plaintiff is currently incarcerated at FCI Englewood, located at 9595 West Quincy Avenue, Littleton, Colorado, 80123.

13.      The Defendant United States of America ("United States") is liable for the tortious acts of its employees in accordance with the FTCA and is the appropriate Defendant for Plaintiffs claims under the FTCA. The United States is a sovereign entity that has waived immunity for

certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

14.    The BOP is a component of Defendant United States' Department of Justice (DOJ).

15.    The BOP operates and is in possession and control of FCI Marion. FCI Marion is a correctional institution that houses male prisoners.

16.    At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters, including at FCI Marion, and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including, but not limited to, Officer Ross.

17.    While acting and failing to act as alleged herein, Defendant had complete custody and total control of Plaintiff.

18.    Plaintiff was dependent upon Defendant for her personal security and necessities.

19.    In performing the acts and omissions contained herein, Defendant, and each of its employees, acted under color of federal law, and each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiff.

20.    Defendant knew or should have known that its conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiff and to her constitutionally, statutorily, and common law protected rights. Despite this knowledge, Defendant failed to take steps to protect Plaintiff and to ensure her rights to safety from sexual assault.

21.    Defendant is liable for the tortious acts of its employees.

22.     At all times relevant hereto, the Defendant, as well as Officer Ross, was acting within the course and scope of said alternative agency, representation, or employment and was within the scope of his authority, whether actual or apparent.

**DEFENDANT KNEW OF AND FAILED TO PROPERLY ADDRESS SEXUAL VIOLENCE RAMPANT ACROSS THE BOP**

23.     Sexual abuse by correctional officers and other prison staff at BOP facilities in the United States has been documented for decades.

24.     In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody*."[2]

25.     That Amnesty Report detailed:

Many women in prisons and jails in the USA are victims of sexual abuse by staff, including sexually offensive language; male staff touching inmates' breasts and genitals when conducting searches; male staff watching inmates while they are naked; and rape.[3]

26.     The Amnesty Report was widely circulated and read by responsible corrections professionals.

27.     Yet sexual violence continued to plague the BOP with little to no systemic response intended to curtail the abuse.

28.     Between 2012 and 2022, BOP opened 5,415 cases of sexual abuse by BOP employees, of which 586 were substantiated.[4]

29.     The true number of sexual assaults that occurred over this period is likely far worse than records indicate because many prisoners do not report sexual assaults for fear of retaliation.

---

[2] "*Not Part of My Sentence: Violations of the Human Rights of Women in Custody*, AMNESTY INT'L (March 26, 2011), https://www.amnestyusa.org/reports/usa-not-part-of-my-sentence-violations-of-the-human-rights-of-women-in-custody/.

[3] *Id*.

[4] STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 117TH CONG., REPORT ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS 18 (Comm. Print. 2022).

30.     An investigation by the Associated Press published in 2021 documented that over a hundred federal prison workers had been convicted or arrested for crimes since 2019, including a drug treatment specialist at Kentucky prison medical center who threatened prisoners' lives if they did not comply with sexual abuse. [5]

31.     The AP reporting also uncovered DOJ's failure to adhere to standard practice by not removing or suspending a prison official tasked with investigating staff misconduct, who was the subject of complaints and arrests himself.[6]

### DOJ Working Group

32.     In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by BOP employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct and looking at the "hundreds of [incidents of] sexual abuse perpetrated by its employees over the past five years."[7]

33.     The working group noted long-standing, pervasive problems throughout the BOP, including insufficient reporting mechanisms, "flawed investigations," and instances of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[8]

---

[5] Michael Balsamo & Michael R. Sisak, *Inside Federal Prisons, Employees are Committing the Crimes*, TORONTO CITY NEWS (Nov. 14, 2021), https://toronto.citynews.ca/2021/11/14/inside-federal-prisons-employees-are-committing-the-crimes/.

[6] *Id.*

[7] *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, PRINCIPAL ASSOC. DEPUTY ATT'Y GEN. WORKING GRP. OF DEP'T OF JUST. COMPONENTS (Nov. 2, 2022), https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf

[8] *Id.*

34.     Additionally, it determined that changes to the "culture and environment in BOP facilities" were needed to address the rampant sexual violence.[9]

35.     The working group found that "advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."[10]

36.     The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."[11]

37.     Significantly, until the early 2020s, "SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."[12]

38.     This practice was a problem because "[t]here is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited. At the same time, requiring such sworn statements runs counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."[13]

39.     Finally, the working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

6

implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[14]

40.     The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated."[15]

41.     The implication of this guidance, given the ongoing and rampant abuse within BOP, is that this message had not been communicated to BOP staff.

42.     Additionally, the working group recommended that the BOP develop an "early warning system" to detect signs that staff may be engaged in sexual conduct and to identify staff with a history of abuse.[16]

43.     This recommendation again suggests that the BOP was not analyzing the data it did have, allowing sexual predators to move from unit to unit or from facility to facility without any systemic tracking or identification.

44.     Despite the working group's suggested changes, which flowed directly from the BOP's statutory and common law duties to the prisoners, Ross was able to sexually assault Plaintiff.

**Memorandum from Office of the Inspector General**

45.     In October 2022, the DOJ Office of the Inspector General (OIG) issued a Management Advisory Memorandum detailing its concerns over how the BOP had been handling

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

administrative misconduct investigations and prisoner statements relevant to those investigations.[17]

46.    The OIG specifically noted that "[t]he BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates."[18]

47.    The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences."[19]

48.    The report explained that the "OIG has serious concerns that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff-on-inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees."[20]

---

[17] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees,* U.S. DEP'T OF JUST., OFFICE OF THE INSPECTOR GEN. (Oct. 2022), https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[18] *Id.* at 3.

[19] *Id.* at 4.

[20] *Id.* at 9.

49.     In sum: "The OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP."[21]

### Criminal Prosecutions

50.     Over the last four years, more evidence of sexual abuse in the BOP has surfaced and resulted in criminal prosecutions.

51.     As relevant here, in July 2020 a BOP corrections officer was prosecuted, convicted, and sentenced to 54 months imprisonment for making false statements related the federal investigation into the sexual assault of a transgender inmate.[22]

52.     In 2022, a jury convicted a former FCI Dublin warden of sexually abusing three prisoners from 2019 through 2021 and making false statements to federal agents. Separate from the warden's own sexually abusive behavior, eight FCI Dublin correctional officers were charged with abusing prisoners during this warden's tenure.[23]

53.     In February 2022, a former FCI Dublin chaplain pleaded guilty to five felony charges related to the repeated sexual abuse of an inmate from 2018 to 2019 and lying to federal agents.[24]

---

[21] *Id.*

[22] *Press Release, Former Federal Corrections Officer Sentenced for Lying to Federal Authorities*, U.S. DEP'T OF JUST., OFFICE OF PUB. (July 15, 2020), https://www.justice.gov/usao-edva/pr/former-federal-corrections-officer-sentenced-lying-federal-authorities.

[23] Lisa Fernandez, *8 Correctional Officers Now Charged with Sex Abuse at FCI Dublin; 7 Found Guilty*, Fox KTVU (July 17, 2023), https://www.ktvu.com/news/8-correctional-officers-now-charged-with-sex-abuse-at-fci-dublin-7-found-guilty.

[24] *Press Release, Federal Prison Chaplain Sentenced for Sexual Assault and Lying to Federal Agents,* U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (Aug. 31, 2022), https://www.justice.gov/archives/opa/pr/federal-prison-chaplain-sentenced-sexual-assault-and-lying-federal-agents.

54.     In April 2022, a former corrections officer and drug treatment specialist at the Federal Medical Center in Lexington, Kentucky (FMC Lexington) pleaded guilty to sexually abusing four prisoners – all participants in his drug treatment classes – between August and December 2019.[25]

55.     In June 2023, a jury convicted a former FCI Dublin corrections officer of sexually abusing two prisoners from 2019 to 2020.[26]

56.     In September 2023, a former FMC Lexington corrections officer pleaded guilty to sexually abusing an inmate on more than one occasion in September 2022.[27]

57.     Also in September 2023, a former FCI Dublin corrections officer pleaded guilty to four counts of sexual abuse of a ward and five counts of abusive sexual contact, involving seven victims.[28]

---

[25] *Press Release, Former BOP Employee Sentenced to 80 Months in Prison for Sexual Abuse of a Ward*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (July 29, 2022), https://www.justice.gov/archives/opa/pr/former-bop-employee-sentenced-80-months-prison-sexual-abuse-ward.

[26] *Press Release, Jury Convicts Federal Correctional Officer for Sexual Abuse of Two Female Inmates,* U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (June 6, 2023)**,** https://www.justice.gov/archives/opa/pr/jury-convicts-federal-correctional-officer-sexual-abuse-two-female-inmates.

[27] *Press Release, Former Federal Correctional Officer Pleads Guilty to Sexual Abuse of a Ward*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (Sep. 25, 2023), https://www.justice.gov/archives/opa/pr/former-federal-correctional-officer-pleads-guilty-sexual-abuse-ward.

[28] *Press Release, Seventh Correctional Officer at Federal Facility in Dublin, California, Sentenced to Prison for Sexual Abuse of Female Prisoners*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (March 27, 2024), https://www.justice.gov/archives/opa/pr/seventh-correctional-officer-federal-facility-dublin-california-sentenced-prison-sexual.

58.    In December 2023, a former BOP Pharmacy Technician at FCI Petersburg pleaded guilty to sexually abusing a prisoner between November 2021 and June 2022. The abuse primarily occurred on weekends, when the technician would be alone with the victim in the medical unit.[29]

59.    In January 2024, a former FCI Aliceville corrections officer pleaded guilty to sexually abusing two prisoners in 2018 and 2019.[30]

60.    In August 2025, a former FCI Dublin corrections officer and paramedic employed between July 2021 and September 2022 pleaded guilty to repeatedly sexually abusing a prisoner.[31]

61.    Also in August 2025, a former FCI Dublin corrections officer pleaded guilty to abusive sexual contact with a prisoner between March and June 2022.[32]

62.    In December 2025, a former corrections officer at the Federal Correctional Complex in Oakdale, Louisiana was sentenced following his guilty plea to abusive sexual contact with a prisoner in June 2024.[33]

### United States Senate Subcommittee

63.    In 2022, the United States Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs (the Subcommittee) found that the

---

[29] *Former BOP Pharmacy Technician Pleaded Guilty to Sexual Abuse*, U.S. DEP'T OF JUST., OFFICE OF THE INSPECTOR GEN. (Dec. 19, 2023), https://oig.justice.gov/news/press-release/former-bop-pharmacy-technician-pleaded-guilty-sexual-abuse-ward.

[30] *Press Release, Former Federal Bureau of Prisons Corrections Officer Sentenced for Sexually Abusing Inmate in His Custody*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (May 23, 2024), https://www.justice.gov/usao-ndal/pr/former-federal-bureau-prisons-corrections-officer-sentenced-sexually-abusing-inmate.

[31] *Press Release, Two More FCI Dublin Correctional Officers Plead Guilty to Sexually Abusing Female Inmates*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (Aug. 7, 2025), https://www.justice.gov/usao-ndca/pr/two-more-fci-dublin-correctional-officers-plead-guilty-sexually-abusing-female-inmates.

[32] *Id.*

[33] *Former BOP Correctional Officer Sentenced for Abusive Sexual Contact*, U.S. DEP'T OF JUST., OFFICE OF THE INSPECTOR GEN. (Dec. 4, 2025), https://oig.justice.gov/news/press-release/former-bop-correctional-officer-sentenced-abusive-sexual-contact-1.

BOP's Office of Internal Affairs had, at the time of publication, a backlog of 8,000 allegations of employee misconduct, some pending for over five years.[34]

64.    Although the law requires it, the BOP did not systematically use the data it had to analyze and prevent sexual abuse of wards.[35]

65.    The Subcommittee noted that "save for an ad hoc review, the BOP does not ascertain whether the number of sexual abuse allegations at a specific facility or region is trending or part of a larger pattern."[36]

66.    Though the Prison Rape Elimination Act (PREA) standards require the BOP to "collect accurate, uniform data for every allegation of sexual abuse" and "review the data collected to identify problem areas and take corrective action on an ongoing basis," BOP officials admitted they do not analyze complaint data to identify employees who are repeatedly alleged to abuse prisoners, facilities with an outlier number of complaints, or broader system-wide issues."[37]

**FCI Dublin Class Action**

67.    In 2024, the court in the FCI Dublin Class Action found that "the Bureau of Prisons has proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years."[38]

---

[34] STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 117TH CONG., *supra* note 4 at 4.

[35] *Id.* at 22-23.

[36] *Id*. at 23.

[37] *Id*. at pp. 22-23 (quotations cleaned up).

[38] *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 719 (N.D. Cal. 2024) (cleaned up).

68.     In deciding to appoint a Special Master, the Northern District of California determined that the BOP had knowledge of the sexual abuse at BOP facilities and that leadership of the BOP "has been, and is, deliberately indifferent to plaintiffs' risk of abuse."[39]

69.     The Court made that determination because of the delays in action by the BOP Central Office, who first received complaints of sexual abuse from FCI Dublin in 2019, yet did not start prosecuting these cases until 2021.[40]

70.     In 2024, a Special Master Report unearthed a series of deficiencies at the California facility, some of which "are likely an indication of systemwide issues within the BOP, rather than simply within FCI Dublin."[41]

71.     The report's findings detailed the failures of the BOP, including "the failure of Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been identified [sic] in multiple audits and investigations."[42]

72.     The Special Master also found that "management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of AICs [adults in custody] at great risk for many years."[43]

73.     The Special Master found "numerous operational, policy, and constitutional violations" across the BOP, including the failure of the Central Office.[44]

---

[39] *Id.* at 736.

[40] *Id.* at 737.

[41] Wendy Still, *First Report of the Special Master Pursuant to the Court's Order of March 26, 2024*, June 5, 2024, https://static1.squarespace.com/static/64a5d4d138199b2c7c48c3de/t/66d361045918c670b861f4af/1725128967464/FCI+Dublin%2C+Special+Master+Report+%28No+Attachments%29.pdf.

[42] *Id*. at 13.

[43] *Id*.

[44] *Id*.

74.     The Special Master also reported that the BOP had "no standard protocol to report violations."[45]

75.     The Special Master also noted that the BOP-wide data showed less than a 2% acknowledgement rate for Administrative Remedies, which was "difficult to justify."[46]

76.     The Special Master also found that the "BOP does not use PREA or other data to monitor reports of assault."[47]

77.     Further, in a May 2025 report focusing on FMC Carswell, the Special Master found that, at that specific facility, "staff, in general, have difficulty comprehending what constitutes a sexual abuse or PREA complaint."[48]

78.     Specific examples included five Dublin class members at FMC Carswell who reported they had tried many times to file PREA complaints, and a woman who was observed by male and female officers while she underwent a vaginal hysterectomy. The original investigating officer found no action was warranted, even though policy dictates that it should have been referred to the Office of Internal Affairs.[49]

79.     The Report also found that: "Additionally, there appears to be a basic misunderstanding regarding the role of the PREA Compliance Manager and staff at FMC Carswell

---

[45] *Id*. at 29.

[46] *Id.* at 10, 70.

[47] *Id*. at 29.

[48] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 2nd Public Monthly Status Report May 1 - 31, 2025, 55, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-May-2025-Monthly-Consent-Decree-Report-FINAL-July-29-2025.pdf at 55.

[49] *Id*. at 56.

regarding the requirement that a sexual abuse complaint be logged, documented, and forwarded to the investigative level."[50]

80.     In another required report, the Special Master found that PREA Compliance Monitors (PCMs) at each BOP facility "appear to lack the full scope of training and knowledge the Orientation Guide mentions. These deficiencies appear to contribute to the lack of a safe environment for Class Members at these facilities. Furthermore, PCMs assume this role on a rotation basis, with little training provided by BOP."[51]

**Government Accountability Office**

81.     On September 29, 2025, the United States Government Accountability Office (GAO) released a report titled "Bureau of Prisons: Strategic Approach Needed to Prevent and Address Employee Misconduct."[52]

82.     The GAO found that, between October 2013 and February 2025, the BOP Office of Internal Affairs opened 86,193 cases and complaints of employee misconduct.[53]

83.     While that number includes all employee misconduct allegations, BOP investigated more sexual abuse allegations than any other category, except for the introduction of contraband.[54]

---

[50] *Id.*

[51] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 1st Quarterly Status Report, March 31 – June 30, 2025, 22, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-1st-Quarterly-Report-March-31-June-30-2025-FINAL.pdf at 22.

[52] U.S. Government Accountability Office, Report to Congressional Requesters, *Bureau of Prisons: Strategic Approach Needed to Prevent and Address Employee Misconduct*, September 2025, https://www.gao.gov/assets/gao-25-107339.pdf.

[53] *Id.* at 28.

[54] *Id.* at 43.

84.     Further, the fourth-most investigated category was inappropriate relationships, which "could involve [BOP] employees engaging in inappropriate sexual relationships with subordinates or showing partiality toward incarcerated individuals."[55]

85.     In short, the long history of the Defendant's mismanagement created the conditions that led directly to Plaintiff being sexually assaulted and sexually abused by a BOP staff member under his care, and who, had Defendant systematically monitored, as they should have according to their responsibilities, would have been terminated or otherwise removed from his position of power.

86.     This mismanagement existed in the face of binding regulations requiring the contrary.

### Prison Rape Elimination Act & Defendant's Failures

87.     Binding PREA regulations, which apply across the BOP, mandate staff reporting, where all BOP staff are required to "report immediately . . . *any knowledge, suspicion, or information* regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a) (emphasis added).

88.     When an incarcerated person is subject to a substantial risk of imminent sexual abuse, the BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62.

89.     In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." 28 C.F.R. § 115.71(a).

---

[55] *Id*.

90.     Further, "[w]here sexual abuse is alleged, the agency shall use investigators who have received special training in sexual abuse investigations." 28 C.F.R. § 115.71(b).

91.     The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. 28 C.F.R. § 115.76(b).

92.     BOP shall also offer victims medical and mental health care by the BOP. *See* 28 C.F.R. § 115.83.

## Defendant Was on Notice That Plaintiff Was at Risk for Sexual Victimization

93.     Defendant had countless opportunities to follow PREA mandates and stop Ross' misconduct. Ross' actions, including, but not limited to, engaging in sexual abuse of Plaintiff were obvious of and suspicious for sexual misconduct.

94.     On or about March 16, 2022, during an individual therapy session with Dr. Owings, Plaintiff expressed her continued concerns regarding her safety at an all-male institution and disclosed that many inmates make statements to her and/or behave in a manner that is objectifying and makes her feel uncomfortable.

95.     On or about April 13, 2022, during an individual therapy session with Dr. Lindsay Owings, Ph.D., Plaintiff expressed that she did not feel fully safe at FCI Marion given the male population and the number of sexual offenders who had declined treatment and were residing on the compound. Although Plaintiff was not currently being sexually harassed or sexually abused, she was worried about what could happen to her when she was alone or outside of a group.

96.     On or about May 25, 2022, during a therapy session with Dr. Owings, where she disclosed that she often would not go to outside recreation because she is concerned that men on the compound follow her, make lewd comments, engage in objectifying behavior, and/or otherwise make her feel uncomfortable. Plaintiff further disclosed that it was possible that she would not

17

report such behaviors if they occurred due to her fear that she would be removed from the BOP's gender-affirming medical and social transition care program (GAC Program).

97.     On or about June 15, 2022, during a therapy session with Dr. Owings, she again reiterated that she did not feel safe at FCI Marion but would be disinclined to report abuse because it could interfere with her treatment in the GAC Program.

98.     On or about October 12, 2023, during an individual therapy session with Dr. Owings, Plaintiff disclosed that, with a lot of new inmates coming to FCI Marion, a lot has changed on the recreation yard, and she was getting more and more concerned for her safety.

99.     On or about December 8, 2023, BOP Psychology Services staff at FCI Marion, including Dr. Owings, conducted a formal psychological assessment of Plaintiff's risk for sexual victimization pursuant to PREA protocol.

100.     That assessment identified risk factors including prior sexual predation against Plaintiff, prior childhood and prison sexual victimization, a history of low-level mental illness and suicidal ideation, and a vulnerable psychological presentation, and concluded that Plaintiff was at elevated risk of sexual victimization.

101.     Based on that assessment, BOP Psychology Services recommended that Plaintiff not be housed with inmates at increased risk for sexual abusiveness and that she receive greater supervision for work and education assignments. The unit team and correctional staff were notified of this recommendation.

### Officer Ross Sexually Harassed, Abused, and Assaulted Plaintiff

102.     As of October 7, 2021, Plaintiff was incarcerated at FCI Marion.

103.     At all times relevant herein, Officer Ross was a corrections officer at FCI Marion and assigned to Plaintiff's housing unit.

104.    In or around September 2023, Ross became the unit officer for Plaintiff's housing unit two days per week.

105.    In or around October 2023, Plaintiff reported to Ross that another inmate was stalking her and that she was afraid of that inmate. Ross asked Plaintiff whether she wanted to file a formal report, and Plaintiff declined, explaining that she feared being removed from the GAC Program if she did so.

106.    Ross knew that Plaintiff was terrified of being removed from the GAC Program and that this fear would prevent her from reporting the other inmates' misconduct or, later, Ross' own misconduct. Plaintiff also confided in Ross that she had experienced suicidal ideation and dreaded losing access to the GAC Program above nearly all else.

107.    Ross exploited this knowledge to groom Plaintiff. He cultivated a friendship with her, encouraged her to confide in him, and gave her gifts, including her favorite candy. Ross also disclosed personal details about his own life to gain Plaintiff's trust, including that his wife had discovered him with another woman with whom he had recorded a sexual act, and made shifting statements about prior relationships with transgender women inmates.

108.    Beginning in or around September 2023 and continuing through the winter of 2023, Ross began coming to Plaintiff's cell during late night and early morning hours under the guise of "checking on" her, at times sitting in a chair outside her cell and demanding that she talk to him.

109.    During this period, Ross also began making sexually inappropriate comments to Plaintiff about her breasts and other parts of her body and began insisting that Plaintiff show him her bare breasts. Plaintiff complied out of fear that if she did not, Ross would follow through on his repeated threats to have her removed from the GAC Program.

110.    Ross also began demanding that Plaintiff come to his office in the early morning hours before the end of his shift. Plaintiff initially complied. As Ross' conduct became increasingly aggressive and sexual, Plaintiff attempted to stop going to his office despite his continued demands.

111.    Between the Fall of 2023 and March 2024, Officer Ross repeatedly coerced Plaintiff to submit to Ross touching Plaintiff's breasts, groin, thighs, and buttocks.

112.    When Plaintiff resisted, Ross retaliated and escalated his threats. On at least one occasion, Ross had other inmates' cells in Plaintiff's housing unit searched ("tossed") for contraband and told those inmates that Plaintiff was responsible. Ross repeatedly told Plaintiff that if she did not come to his office, he would have her, and other transgender inmates, removed from BOP's GAC Program and would blame Plaintiff for it. Ross also threatened to revoke Plaintiff's privileges, including outdoor recreation time, if she did not comply with his demands.

113.    On more than one occasion, Ross told Plaintiff that he was monitoring her email and phone communications and instructed her not to mention his name in any communications, warning that he would know if she reported his misconduct. Ross threatened to suspend Plaintiff's incoming and outgoing email correspondence and prohibit her visitation with loved ones if she did not comply.

114.    On one occasion, Ross repeated back to Plaintiff the contents of conversations she had over the phone, to demonstrate to Plaintiff that he was, in fact, monitoring her calls.

115.    During another instance, Ross confirmed to Plaintiff that she had not mentioned his name in her recent phone calls and rewarded her compliance by bringing her candy. Ross also rewarded Plaintiff's silence following instances of sexual abuse by increasing her outdoor recreation time, phone time, and other unit privileges.

116.     As a result of these threats, Plaintiff resumed going to Ross' office and by the end of 2023, Ross' conduct had escalated to include groping Plaintiff's breasts, forcing Plaintiff's hand onto his penis over his clothing, grinding his pelvis against Plaintiff's buttocks, and kissing Plaintiff's neck.

117.     In or around January 2024, Ross became the unit officer for Plaintiff's housing unit five days per week, substantially increasing his access to Plaintiff and the frequency of his demands that she comes to his office.

118.     During one such visit, Ross attempted to sexually assault Plaintiff. Ross forced Plaintiff against the wall of his office, groped her breasts, and pulled down her pants. Ross exposed his erect penis and demanded that Plaintiff apply A & D ointment to his penis.

119.     Ross then forced Plaintiff against the wall and attempted to penetrate her anus with his penis, using enough force that Plaintiff lost her balance and fell into the doorway.

120.     Ross became fearful that staff would be able to see Plaintiff in his doorway and stopped his assault. Ross became angry and told Plaintiff that she could not "make moves like that." Plaintiff was terrified and suffered physical and emotional trauma as a result.

121.     Officer Ross again threatened Plaintiff that if she reported his conduct, he would have her removed from the GAC Program, and that he would also have other transgender inmates removed from the program because of Plaintiff's report and Ross continued his sexual abuse towards Plaintiff.

122.     On or about March 2, 2024, Officer Ross informed Plaintiff that he was being transferred to a different unit and his assignment to Plaintiff's unit was ending at the end of the March 2024 quarter.

123.     Ross then demanded Plaintiff come to his office. Officer Ross told Plaintiff if she did not show up there "would be problems."

124.     Plaintiff complied and during this encounter Officer Ross insisted Plaintiff go into the staff bathroom, which was directly across from Officer Ross' office and wait for Officer Ross.

125.     Plaintiff complied with Ross' instructions and entered the staff bathroom. Shortly after Plaintiff entered, Ross followed her into the bathroom.

126.     Officer Ross forced Plaintiff up against the bathroom sink and began kissing Plaintiff's neck and groping her bare breasts.

127.     Officer Ross then pulled out his lubricated penis and forced Plaintiff to grab his penis.

128.     Officer Ross then shoved Plaintiff towards the bathroom sink and forcefully removed Plaintiff's underwear and sexually assaulted Plaintiff by penetrating her anus with his penis using such force that Plaintiff felt instant and severe pain.

129.     Upon hearing the sound of another staff member's keys as they approached the bathroom, Ross became concerned and instructed Plaintiff to wait several minutes before returning to her cell, so that he could leave the bathroom first. Plaintiff was again terrified and suffered physical and emotional trauma as a result.

130.     Within approximately one week of the assault, Sarah Dietrich, Plaintiff's mental health counselor employed by BOP, noticed changes in Plaintiff's demeanor, behavior, and overall well-being.

131.     Ms. Dietrich received verbal reports from other inmates that "something happened" to Plaintiff as they too noticed Plaintiff's overall behavior had drastically changed.

132.    Ms. Dietrich continued to confront Plaintiff, indicating that she had reason to believe something traumatic happened to Plaintiff. Ms. Dietrich demanded Plaintiff to explain why there was a change in Plaintiff's behavior as Plaintiff has become increasingly withdrawn in group therapy sessions. Plaintiff did not disclose the assault at that time.

133.    Ms. Dietrich then alerted Dr. Owings, who Plaintiff was regularly seeing at BOP.

134.    Dr. Owings confronted Plaintiff, and Plaintiff admitted she was going to be reporting an incident that happened to her but was extremely concerned she would get removed from the GAC Program. Dr. Owings indicated that the only way Plaintiff would definitely be removed from the GAC Program was if the complaint involved a staff member.

135.    On or about March 10 or 11, 2024, Plaintiff sent a report of Ross' assault to the Bureau of Prisons' Transgender Executive Council email box and to the Department of Justice.

136.    Shortly thereafter, BOP staff member Lieutenant Huggins informed Plaintiff that BOP had received a report of the sexual assault and that Plaintiff was being taken to the hospital.

137.    On or about March 11, 2024, Plaintiff was taken to SIH Herrin Hospital, where she underwent a Sexual Assault Nurse Examiner (SANE) evaluation related to Ross' sexual assault. Plaintiff was administered post-exposure prophylaxis and was discharged with instructions to follow up with a primary physician and the county health department within one week.

138.    As a direct and proximate result of Ross' sexual assault, Plaintiff developed and was diagnosed with new and exacerbated physical and psychological injuries.

139.    On or about April 2, 2024, Plaintiff first reported new-onset lower back pain radiating to her hip. On or about April 11, 2024, the pain had intensified and extended from her cervical spine down to her right hip, worsening with standing and ambulation, and was not adequately relieved by over-the-counter medication.

140. On April 5, 2024, Plaintiff was diagnosed with a new onset anxiety disorder with associated sleep disturbance, which her treating provider attributed to Post-Traumatic Stress Disorder resulting from the assault. Plaintiff was prescribed Buspirone to treat this condition.

141. On April 11, 2024, Plaintiff's diagnosis was formally updated to Post-Traumatic Stress Disorder, after her treating provider determined that the March 2024 sexual assault, combined with her prior traumatic exposures, satisfied the full diagnostic criteria for that condition. Psychological testing administered that same day yielded clinically severe results.

142. These diagnoses and clinical findings are the direct and proximate result of Ross' sexual assault of Plaintiff and Defendant's failure to protect her from that assault, and they form part of the basis for the damages sought herein.

143. Following Plaintiff's report of her sexual assault to BOP's Central Office, she was placed in the SHU, which caused her additional distress, trauma, and mental anguish that required her to be prescribed anti-anxiety medication.

144. As stated above, by December 2023, Plaintiff reported to BOP Psychology Services that she feared reporting incidents to staff because doing so risked Special Housing Unit (SHU) placement, which would jeopardize her participation in the sex offender treatment programming.

145. This documented fear of reporting, recorded contemporaneously in Plaintiff's mental health records and predating the sexual assault alleged herein, corroborates the pattern of institutional fear of retaliation described above and explains any delay in Plaintiff's reporting of Ross' misconduct.

146. Numerous other correctional officers at FCI Marion observed Plaintiff in Ross' office at times when she was not authorized or scheduled to be there, further placing Defendant on

notice of Ross' ongoing misconduct. These types of violations would typically result in disciplinary tickets for inmates and disciplinary action against the correctional officer.

147. Even so, Defendant took no action to investigate or stop this suspicious and recurrent behavior. This violated mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

148. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women and other vulnerable prisoners face and is the direct and proximate cause for Plaintiff's damages.

149. Pursuant to 28 U.S.C. § 2675(a), Plaintiff properly presented her claim to the United States.

**CAUSES OF ACTION**

**COUNT I – NEGLIGENCE UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)**

150. Plaintiff realleges and incorporates into Count One the allegations set forth above, as if fully set forth herein.

151. At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees, undertook and endeavored to, and did provide custodial care to people incarcerated at FCI Marion, including, but not limited to, Plaintiff.

152. At all relevant times, Defendant United States had a duty to protect Plaintiff and other prisoners from the reasonably foreseeable harm of sexual abuse and/or assault by its employees, including Ross.

153. At all relevant times, Defendant United States acted negligently in its indifference to Plaintiff's safety.

25

154. At all relevant times, Defendant United States hired correctional and administrative employees at FCI Marion, including Ross, as well as colleagues and supervisors of Ross whose identities are currently unknown to Plaintiff.

155. At all relevant times, Defendant United States' employees were acting within the scope of their employment, in their official uniforms during work hours, performing work duties, when exercising custodial care, control, and supervision over Plaintiff.

156. At all relevant times, FCI Marion personnel held themselves out to incarcerated individuals as personnel with the ability and knowledge to carry out their duties, provide due care, and act in accordance with standards of reasonable care common and acceptable in the community.

157. At all relevant times and within the scope of their employment by Defendant United States, the above-named and unknown staff, while working within their official capacities at FCI Marion, owed a duty to Plaintiff while Plaintiff was at FCI Marion.

158. It is Defendant United States' duty to maintain, operate, and control FCI Marion as safe and secure spaces for persons in it and for persons in transit to and/or from all BOP facilities, including, but not limited to, Plaintiff.

159. In addition to a custodial duty owed to Plaintiff, Defendant United States of America was statutorily obligated under PREA and BOP policy to protect prisoners from foreseeable harm that included the sexual abuse suffered by Plaintiff.

160. Defendant United States knew or should have known that Ross had a propensity to sexually abuse inmates.

161. Defendant United States knew or should have known that Ross acted inappropriately with prisoners under his care at FCI Marion.

162.     Defendant United States was on notice of the possibility that prisoners would be sexually abused by corrections officers and other facility staff, through the above-mentioned investigations, articles, lawsuits, criminal prosecutions, and reports.

163.     As such, there was a foreseeable risk that correctional officers would sexually abuse Plaintiff and others under their control.

164.     Agents, servants, contractors, and/or employees of Defendant United States did not exercise reasonable care or take reasonable available measures to abate the risk of sexual abuse to Plaintiff, and to ensure their safety, in violation of federal regulations and BOP protocols.

165.     Defendant United States failed to create and implement procedures, training, and supervision that would protect prisoners from the foreseeable risk of harm, including sexual abuse.

166.     Defendant United States knew of or should have known of the risk posed to Plaintiff and other prisoners that they would be sexually assaulted by employees such as Ross.

167.     Defendant United States failed to maintain its facilities in a manner to deter the possibility of sexual abuse, including the above-mentioned lack of video cameras and the availability of unmonitored and isolated spaces in the facility wherein male officers could be alone with female prisoners.

168.     Due to Defendant United States' acts and omissions described herein, it breached its duty to protect Plaintiff and other prisoners from the reasonably foreseeable harm of sexual assault and sexual abuse by its employees, including Ross.

169.     Agents, servants, contractors, and/or employees of the United States did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

170. Agents, servants, contractors, and/or employees of the United States neglected to apply the skill they did have.

171. Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skill they had.

172. Agents, servants, contractors, and/or employees of the United States mistreated Plaintiff and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiff is not yet aware.

173. Plaintiff's injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiff.

174. The failure of FCI Marion personnel to prevent, investigate, or acknowledge Ross" sexual abuse served no legitimate policy purpose.

175. On the contrary, FCI Marion staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. Their failure to do so was patently outside of their discretionary function.

176. Plaintiff's injuries were direct and proximate consequences of Defendant United States':

(a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11;

(b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13;

(c) decision to hire, retain, and promote BOP personnel who were suspected or alleged to

28

have had improper sexual contact, 28 C.F.R. § 115.17;

(d) punishment of victims through disciplinary or retaliatory measures rather than providing proper support and protection, 28 C.F.R. § 115.43;

(e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61;

(f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67;

(g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a); and

(h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

177.    Defendant United States' above-described acts and omissions were a direct and proximate cause of Plaintiff's injuries and damages herein.

**COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM
UNDER FEDERAL TORT CLAIMS ACT
(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

178.    Plaintiff realleges and incorporates into Count Two the allegations set forth above, as if fully set forth herein.

179.    Defendant United States' acts and omissions herein and the acts and omissions of its agents, servants, contractors, and/or employees constituted extreme and outrageous conduct, which caused Plaintiff severe emotional distress following the sexual abuse that she experienced.

180.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, intended to cause, or was recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

181.    Plaintiff, in fact, suffered severe and debilitating emotional suffering. Her emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

182.    Ross engaged in extreme and outrageous conduct through sexually harassing and sexually abusing Plaintiff while she was incarcerated and entirely under the care and control of Defendant United States.

183.    Ross intended to cause Plaintiff severe emotional distress or was recklessly indifferent to the probability of causing such distress when he sexually abused and/or sexually assaulted Plaintiff while he was supposed to be providing custodial care.

184.    At all relevant times, Ross was acting within the scope of his employment at FCI Marion and used his authority as a member of the facility's correctional staff to sexually abuse and/or assault Plaintiff, while Plaintiff did not have the ability to consent or withhold consent.

185.    Plaintiff's injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress and battery) perpetrated by Ross.

186.    Under 28 U.S.C. § 2680(h), Defendant United States is liable for the intentional torts committed by Ross, and his abuse of his position of authority as a correctional officer, within the scope of his employment and under color of federal law.

187.    At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees, including Ross, was acting under color of authority as "law enforcement officers" within the meaning of 28 U.S.C. § 2680(h).

188.    At all relevant times, Ross supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and/or imprisoned Plaintiff within the scope and course of his employment with Defendant United States. All BOP employees are charged with maintaining

30

security of the institution, and staff's correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

189.    At all relevant times, Defendant United States individually or through its agents, servants, contractors, and/or employees including Ross, used their authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and/or assault Plaintiff and to prevent her from disclosing the sexual assaults for fear of retaliation, victim-blaming or -shaming, and additional assaults, among others.

190.    Defendant United States is vicariously liable for the intentional torts committed upon the Plaintiff. The conduct described above constitutes the tort of intentional infliction of emotional distress under the laws of the State of Illinois.

191.    Thus, Plaintiff brings this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers, including Ross.

192.    As a result of FCI Marion personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, and as a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

193.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and

reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

## COUNT III –BATTERY UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

194.    Plaintiff realleges and incorporates into Count Three the allegations set forth above, as if fully set forth herein.

195.    Ross committed a battery on Plaintiff. It was impossible for Plaintiff to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is 1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

196.    Ross acted within the scope of his authority and employment as a federal employee in the administrative unit at FCI Marion.

197.    Plaintiff reasonably believed that Ross was in a position of control or authority and did not have the ability to consent or not consent to sexual acts that he initiated.

198.    With the intent to cause harmful or offensive contact, Ross subjected Plaintiff to sexual acts to which she could not consent.

199.    The sexual acts constituted harmful contact with Plaintiff, and these acts were deeply offensive to her personal dignity and would offend a person of ordinary sensitivity.

200.    These above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

201.    As a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological

injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

202.     As a direct and proximate result of Defendant's conduct, Plaintiff suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

203.     Defendant United States of America is liable for the intentional torts committed by Ross and his abuse of his position of authority as a correctional officer within the scope of his employment.

**COUNT IV – NEGLIGENT SUPERVISION UNDER FEDERAL TORT CLAIMS ACT**
**(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

204.     Plaintiff realleges and incorporates into Count Four the allegations set forth above, as if fully set forth herein.

205.     Like all employers, Defendant United States had a duty to supervise its employees, including Ross.

206.     Defendant United States hired Ross and other abusive employees and allowed them to use their positions of power within the facility to exert influence over prisoners, such as Plaintiff.

207.     Defendant United States knew that potential abusers, such as Ross, would have the opportunity to be alone with female and/or transgender prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.

208.     Defendant United States failed to properly oversee and administer FCI Marion, including Officer Ross, and failed to properly implement BOP and PREA policies that would have deterred sexual abuse, such as that suffered by Plaintiff.

209.     Defendant United States had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff, through the reports, civil lawsuits, and criminal prosecutions mentioned above.

210.     Defendant United States' knowledge of prior sexual abuse at BOP facilities, including FCI Marion, placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Plaintiff.

211.     Defendant United States had properly supervised employees, and facility staff, such as Ross, would not have the opportunity and/or ability to sexually abuse prisoners.

212.     If Defendant United States of America had properly supervised and investigated employees and facility staff, such as Ross and his supervisors, it would have learned of his propensity to commit sexual abuse.

213.     Defendant United States' above-described acts and omissions were a direct and proximate cause of Plaintiff's injuries and damages herein.

### COUNT V – TRAFFICKING VICTIMS PROTECTION ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

214.     Plaintiff realleges and incorporates into Count Five the allegations set forth above, as if fully set forth herein.

215.     Officer Ross knowingly recruited, enticed, and solicited Plaintiff by offering benefits and things of value, such as continuing to receive privileges, not being further retaliated

against or experiencing additional physical violence, for engaging in sex acts, and made Plaintiff engage in sex acts through force and coercion.

216.     Observing BOP employes knew of or should have reasonably known that Ross was soliciting Plaintiff in exchange for sex acts, and benefited by failing to protect Plaintiff.

217.     This conduct caused Plaintiff serious harm, including without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. §§ 1591 and 1595.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against the Defendant as follows:

(a) An award of compensatory, punitive, and nominal damages to Plaintiff in an amount to be determined at trial;

(b) An award to Plaintiff of the costs of this suit and reasonable attorneys' fees and litigation expenses; and

(c) For such other and further relief as this Court may deem just and proper.

Date: July 13, 2026                                Respectfully submitted,


                                                   s/Maura D. White


                                                   Maura D. White
                                                   Romanucci & Blandin
                                                   321 N. Clark St., Suite 900
                                                   Chicago, IL 60654
                                                   mwhite@rblaw.net
                                                   (312) 253-8632
                                                   *Attorney for Plaintiff*